1
2
3
4
5
6
7                       UNITED STATES DISTRICT COURT

8                       EASTERN DISTRICT OF CALIFORNIA

9

10    ADAM DANIEL ANAYA,                    Case No. 1:15-cv-01285-AWI-MJS (HC)

11              Petitioner,                 **FINDINGS AND RECOMMENDATION TO**
                                            **DENY PETITION FOR WRIT OF HABEAS**
12         v.                               **CORPUS**

13    M. Eliot Spearman, Warden             **(ECF NO. 1)**

14              Respondent.                 **THIRTY (30) DAY OBJECTION DEADLINE**

15

16

17

18          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

19    corpus under 28 U.S.C. § 2254. M. Eliot Spearman, Warden of High Desert State Prison,

20    is hereby substituted as the proper named respondent pursuant to Rule 25(d) of the

21    Federal Rules of Civil Procedure. Respondent is represented by Lewis Albert Martinez of

22    the Office of the California Attorney General.

23          The petition raises the following claims: (1) instructional error unfairly bolstered

24    the credibility of prosecution witnesses; (2) instructional error unfairly impeached

25    Petitioner's credibility; and (3) there was insufficient evidence to support a conviction for

26    extortion. (ECF No. 1.)

27          As discussed below, the undersigned recommends the petition be denied.

28

## I. Procedural History

In 2011, Petitioner was convicted after a jury trial in the Superior Court of California, County of Tulare, of extortion, burglary, home invasion robbery, battery, dissuading a witness or victim, participation in a criminal street gang, and receiving stolen property. The jury also found true the special allegation that the offenses were committed for the benefit of a street gang. In bifurcated proceedings, the court found prior strike and serious felony special allegations to be true. On October 21, 2011, Petitioner was sentenced to a term of 35 years to life for the home invasion robbery and prior felony conviction, with additional concurrent or stayed terms for the remaining counts. (Lodged Doc. 4 at 991-992.)

On January 10, 2012, prior to briefing on his direct appeal, Petitioner filed a petition for writ of habeas corpus in the Fifth District Court of Appeal. (Lodged Doc. 24.) The petition was denied on the ground Petitioner had failed to show the issues raised were not cognizable on appeal. (Lodged Doc. 25.)

On October 7, 2013, the California Court of Appeal, Fifth Appellate District, reversed the conviction for receiving stolen property. The case was remanded for resentencing on the convictions for extortion and dissuading a witness or victim. The trial court also was directed to amend the judgment as to some of the enhancements. (Lodged Doc. 22 at 65.) Petitioner filed a petition for review in the California Supreme Court. (Lodged Doc. 26). On February 11, 2014, the California Supreme Court denied Petitioner's petition for review. (Lodged Doc. 27).

On April 30, 2014, Petitioner was resentenced in the Tulare County Superior Court to a term of thirty-five years to life. (Lodged Doc. 23.)

On April 20, 2015, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. (Lodged Doc. 28.) On July 8, 2015, the petition was summarily denied. (Lodged Doc. 29.)

Petitioner filed the instant petition on August 21, 2015. (ECF No. 1.) On November 19, 2015, Respondent filed an answer. (ECF No. 14.) On January 22, 2016, Petitioner filed a traverse. (ECF No. 18.) The matter is submitted.

## II. Factual Background

The following facts regarding the underlying offense are taken from the Fifth District Court of Appeal's opinion, filed on October 7, 2013, and modified and partially published on November 5, 2013. They and are presumed correct. 28 U.S.C. § 2254(e)(1).

### Facts Specific to the January 2010 Incident

Eric Dahlberg lived across the street from his friend Roy Gomez in Tulare. On January 31, 2010, Dahlberg called 911 after he became concerned about a number of people he observed at Gomez's home. He had never seen these six or so men at his neighbor's home before. Gomez and the others were standing near the driveway and appeared to be talking. But then Gomez started backing up and the others were getting closer, "kind of circling around him." Dahlberg thought it was a "little suspicious." Gomez had backed up to the garage door and put his hands up. Shortly thereafter, Gomez's cousin came out from inside the house.

Although Dahlberg could not hear what was being said, he could see clearly. He focused on one person who appeared older and "darker." That individual stood out and seemed like he was telling the others what to do. He made lots of hand gestures: when he pointed to the curb, two individuals went to the curb; when he pointed to the house, everyone else went inside.[FN4] That individual also used his cell phone a couple of times. The individual "was in Roy's face," while the others were behind him. Dahlberg did not witness any physical altercation.

> [FN4: Two individuals stayed at the curb when the others went inside. They looked up and down the street.]

By the time the police arrived in response to his call, Dahlberg was at the back of his house. Because he could not clearly see individual faces, he could not identify anyone other than Gomez and his cousin. Later, Gomez came to

Dahlberg's door. He was "breathing hard" and was "acting shocked."

Another neighbor, Richard Hernandez, was outside working on his truck that same day. He recalled seeing "a bunch of guys" pull up in a couple of cars. He figured they were friends of Gomez's. It was not unusual until he noticed the group had Gomez backed up against the garage door. There were six or seven men, most of whom were young. Two were older and one stood out because he was the only one talking and everyone else surrounded him. Hernandez could not decide if that man was African–American or a dark complexioned Hispanic. That man was loud, "running his mouth," yelling and screaming.

Hernandez became concerned because Gomez was standing against the garage and everyone was "surrounding him." They no longer looked like friends. Although he did not talk to Gomez's cousin much, he knew who he was and he recognized him when he came outside. The group's focus then shifted to Gomez's cousin and they all went inside. About 10 minutes later, the police arrived.

When Hernandez gave his statement to police, his memory was fresh; he told the truth. He told Detective Jesus Guzman that the darker man had told Gomez's cousin, "This doesn't concern you. Get out of here." He recalled seeing the darker man on his cell phone; he wore a red hat. Gomez's cousin told the darker man that he did not have much money, but that he could take what he had. Hernandez recalled telling the detective that he saw "a larger white guy try to strike" Gomez.

In January 2010, Norteño gang member A.T. was living with his aunt, uncle, and cousin Roy Gomez in Tulare. In response to a midmorning knock, A.T. answered the door to find a man he believed to be John Delgado [FN5] asking to speak with his cousin. He knew who Delgado was because Delgado had visited Gomez in the past. A.T. noted there were other people waiting outside near a white truck and a white car, but he did not recognize the others. Gomez stepped outside with Delgado.

[FN5: "John" Delgado was actually Steven Delgado.]

A.T. resumed speaking on the telephone with his girlfriend. Eventually, he heard people talking loudly or shouting. He

hung up the telephone, assuming there was an argument, and went outside.

Once outside, A.T. found his cousin with his back to the garage. About seven people were encircling him. Gomez's hands were out (palms out at shoulder height) in front of him. He seemed scared and confused. Those surrounding Gomez were later identified as [Co-Defendant Eric Thomas] Wolfe, Anaya, Steven Delgado, Robert Pompa and others. Wolfe was standing "kind of offset"; A.T. had never met Wolfe but knew who he was.

Realizing the argument was about a debt [FN6] he himself owed, A.T. asked what was going on. Wolfe told A.T. to mind his own business and continued to confront Gomez over the fact he "owed the homies money." Eventually, A.T. was able to tell Wolfe that it was not Gomez they were looking for, rather it was him. Wolfe made a phone call. He then apologized to Gomez and pointed to A.T., saying, "You are the one."

> [FN6: A.T.'s debt was incurred as a result of borrowing money or drugs from the gang (then selling the drugs for profit). A.T. borrowed from the gang on two occasions, fell behind on payments, and had not repaid that debt plus "tithe" and interest.]

Anaya, who had been standing near the sidewalk, said "cops," and pointed down the street. In response to this news, everyone went inside the house. Once inside, A.T. was surrounded by Wolfe, Delgado, Pompa and another individual. Anaya and a second individual stayed at the window as lookouts. Pompa struck him in the face and he was verbally harassed. Wolfe told A.T. he owed money and began grabbing items in the house. A.T. tried to explain that the house belonged to his aunt and that the property in the home was not his. He offered to pay what he owed, and also offered the $200 he had in his possession. In the room A.T. shared with his cousin, Wolfe and Anaya were "taking things apart"; A.T. again explained most of the property belonged to his aunt. Wolfe or Delgado told him to shut up.

About this same time, the police knocked on the door. The officers had everyone exit the back room with their hands up. Identification was checked and names were taken. A.T. gave the officers a false name because he had violated his parole.[FN7] Ultimately, no one was arrested and the police

left. A.T. did not say anything to the police then because he had been told to shut up.

> [FN7: In 2006, A.T. was convicted of second degree burglary and receiving stolen property.]

After the police left, Wolfe, who did most of the talking, told A.T. what was going to happen. Wolfe said A.T. owed $5,000, it needed to be paid, and they would be taking items with them. He was reminded that he knew "what happens" to people who do not "pay up." He would be given a phone number for "Pablo." He was to call Pablo in an hour to receive additional information about whom to pay. A.T. told Wolfe he would do his best to pay the debt. Thereafter, A.T.'s belongings were loaded into a white or cream-colored Chevrolet Blazer, including computers, printers, hard drives and keyboards. He did not give anyone permission to take the items.

After Wolfe, Anaya and the others left, A.T. called the telephone number he was given for Pablo. He recognized the voice on the other end as that of Wolfe. A.T. was told to call the number the following day about a meeting. The next day, he called Pablo's number again; Wolfe answered. Wolfe advised A.T. that he would be picked up in 30 minutes; however, a few moments later, Wolfe called back. A.T. was advised they were waiting for him outside.

A.T. went outside and got into the car as requested. Wolfe was driving, Pompa was the front seat passenger, and Delgado was in the back. They went to what A.T. assumed was Pompa's home. Pompa offered him a beer, but he declined. He was nervous and fearful. Wolfe advised him he had 29 days within which to pay back $5,000. Although A.T. had borrowed $3,000, the amount increased significantly because of "fines." A.T. asked that his belongings be returned, but Wolfe denied the request. A.T. also asked if he could have "assistance" in repaying the debt. After making a telephone call, Wolfe denied A.T.'s request for assistance.

Despite having no job [FN8] or other financial resources, A.T. understood that if he did not repay the debt, he would be "done," as stated by Wolfe. A.T. understood "done" as meaning he would "be whacked" or killed. A.T. was further advised that if he loved his kids, he would pay the money within the timeframe provided. He was then taken home.

[FN8: When in good standing, A.T. sold drugs on behalf of the Norteño gang. He is no longer a Norteño gang member.]

Three or four days later, A.T. was arrested for absconding from parole and was taken to jail. Although he did not want to tell police about what had happened, and knew he was risking his life by doing so, A.T. also feared what would happen when the debt repayment deadline expired. He gave a statement to Detective Guzman and received protective custody.[FN9]

[FN9: Once he was released from custody, A.T. was provided with additional protection in the form of housing, utilities, and food assistance, and was provided a cell phone as well. He received that assistance between February and September 2010, but was ultimately asked to leave the program after breaking a rule.]

While serving time in jail, A.T. was transported to the Bob Wiley Detention Facility. On a bus returning from court, Wolfe was seated behind him. Wolfe told him "not to do it," and that he could fix everything, including A.T.'s status with the gang. Wolfe offered A.T. a car and some money not to say anything. A.T. did not believe him. On another occasion, as he and Detective Guzman passed Wolfe in a cell, Wolfe said, "Don't do it A[.]."[FN10] That meant A.T. should not talk to the police.

[FN10: Jesus Flores, a correctional deputy with the Tulare County Sheriff's Department, testified that on February 5, 2010, he was working at the main jail. He and Detective Guzman were escorting A.T. toward an interview room. As the group passed cell No. 7, Flores heard someone say, "A[.], don't do it, don't do it." Flores looked back and saw Wolfe.]

A.T. is still afraid because he still owes money. By testifying, he is considered to be "telling on" defendants and "the whole rest of the gang."

Tulare Police Officer Jeremy Faiman testified that on January 31, 2010, about 1:10 p.m., he responded in a marked K9 patrol unit to a possible home invasion in progress. As he approached the home, he observed two subjects standing out front, looking up and down the street. After calling for additional units, he contacted those subjects, who were

identified as Manuel Rubio and Mario Duarte. As he directed Rubio and Duarte to sit down with their hands in sight, Roy Gomez exited the home, quickly shutting the door behind him. Gomez consented to a look around the house, indicating a couple of "homies" were inside. He was nervous.

Officer Faiman and an undercover officer approached the unlocked door. They entered and cleared the home. Several people exited a bedroom. Everyone was "really calm. It was almost a scary calm." Wolfe, Anaya, Pompa, Delgado, Jaime Rodriguez, and Adrian Vasquez were identified. Other than a legal folding pocketknife, no weapons were found on anyone located in the home. When asked for identification, A.T. provided a false name. Later, Officer Faiman learned A.T.'s true name and that he was wanted for a parole violation.

While the police were present, no one in the home said anything about a crime being committed. They said "everything was cool, they didn't need any police assistance." Officer Faiman did not notice any computer equipment, but he was not looking for it. His focus was on the people inside. The television was not on, there was no beer in view, nor was there any food being prepared or grilled at the home. Thereafter, the investigation concluded and the officers left the residence.

Roy Gomez testified that he was living with his parents and cousin in January 2010. He recalled the day the police came to the house. A couple of friends had come over to watch football and "hang out." He could not recall everyone's name.[FN11] Wolfe was there; he and Wolfe would get together now and then to watch football. Gomez could not recall how often Wolfe had been to his home; he had never been to Wolfe's house. Anaya was also there, arriving with Wolfe. Gomez had been introduced to Anaya previously through a friend whose name he did not remember. There were five or six people total.

> [FN11: Later, Gomez testified that he knew who Delgado and Pompa were. He thought he knew who Mario Duarte, Manuel Rubio and Jaime Rodriguez were as well. He claimed hearing the names of the others present that day "refreshed [his] mind."]

Everyone arrived at the same time because Gomez recalled hearing the doorbell. He believed he answered the door and went outside to speak with them first. Everyone greeted one another, "nothing really serious." Then, with the exception of

8

a few people who had stayed outside to smoke, the group headed inside. They had only been sitting down and watching television for two to three minutes when the police arrived. Gomez could see through the front window when the police arrived, and he went outside to see what the problem was.

The police advised him they had been sent about "a burglary or something going on." Gomez did not want the police to go inside his home, but he did acknowledge he was on parole and thus subject to search. He told the police there was no reason for them to go inside. He sat outside on the curb while the house was searched. After the police left, the group stayed at the house "for a little bit, watched TV and stuff, you know, and then everybody took off."

His cousin A.T. had a lot of computers. A.T. tried to sell everything he had that day, and did sell a computer to Wolfe after the police left. A.T. carried the computer he sold to Wolfe out to Wolfe's white Blazer.

Gomez stated there had not been any dispute or argument that day, nor did any physical violence occur. He did not know if he talked to Detective Guzman after his cousin's arrest. At the police station, Gomez "pled the right to remain silent," so he did not give a statement.[FN12] He denied telling the detective there had been a little misunderstanding and it had been straightened out and was not gang related. He did not tell Guzman he was struck or hit, nor did he tell Guzman that he did not know Wolfe. Neither did he recall telling Guzman anything about computers.

> [FN12: Detective Guzman interviewed Gomez on February 4, 2010, at the Tulare Police Department. The videotaped interview was played for the jury.]

Although he used to be a gang member, Gomez was no longer a gang member because he "grew out of it." And he just "hung out" with the West Side Tulare Norteños. Gomez has three felony convictions, the last in 2005.

Jaime Rodriguez testified for the defense. In January 2010, he recalled walking on the street in Tulare on his way to see his friend Isabel. He saw two friends standing outside a house he later learned belonged to Gomez. He stopped to say hello to Manuel Rubio and Mario Duarte. They spoke for a few minutes and then Gomez invited them inside to watch the polo game and to barbeque. There were no arguments, fights, or disagreements. They watched the polo game for a

few minutes before the police arrived. They had gone into a back room to smoke the marijuana Rodriguez had with him. They also looked at some computers; A.T. offered to sell the computers. The police arrived, but after checking everyone's identification, they left. Rodriguez then left because he was nervous. He was on probation and did not want to go back into custody.[FN13]

> [FN13: On cross-examination, Rodriguez qualified the group was only discussing a barbeque. Detective Guzman testified he took Rodriguez's statement, and Rodriguez had told him there was a barbeque going on in the backyard. Rodriguez made no mention of marijuana.]

On February 4, 2010, Tulare police officers conducted a probation compliance check at a residence in Tulare. The officers were going to attempt to take Wolfe into custody. No one responded to the front door. Helicopter surveillance, however, noted someone leaving through the back. After a vehicle pulled out of the garage, a traffic enforcement stop was conducted on a white Chevrolet Blazer. Wolfe's girlfriend Desiree Villareal was contacted. She reported that Wolfe was at work. A subsequent probation search was conducted and numerous computer parts and equipment were located in the garage.

Detective Guzman with the Tulare County Police Department was assigned to investigate an incident involving A.T. Related thereto, on February 4, 2010, Wolfe and Anaya were taken into custody. Following Miranda (Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694) warnings, Anaya gave a recorded statement. He indicated he was helping his girlfriend's uncle—Robert Pompa—pick up and load some computer equipment. He recalled carrying out a monitor and keyboard from inside a home. Anaya admitted knowing Delgado. He denied being a gang member himself, but acknowledged associating with Northerners, or Norteños.

On February 5, 2010, Detective Guzman responded to the main jail. He and Deputy Flores were walking with A.T. Passing Wolfe's cell, he heard Wolfe say, "[D]on't do it A[.], don't do it."

During the investigation Detective Guzman listened to more than 10 calls made from the Tulare County Sheriff's Department pretrial facility. He recognized the persons speaking in those phone calls as Wolfe, his girlfriend Desiree

Villareal, and Wolfe's stepbrother Dexter Rabadan. Several of the recorded phone calls were played for the jury.[FN14]

> [FN14: An investigator aide with the Tulare Police Department downloaded recordings of inmate phone calls made from the Tulare County jail to a particular telephone number provided by Detective Guzman. Phone calls were made on January 16, February 14, February 18 and February 25, 2010. The same telephone number was associated with all four calls.]

### Facts Relevant to the Gang Allegations

Patrick O'Donohoe is a peace officer with the City of Tulare. While on duty on November 20, 2006, O'Donohoe came into contact with Anaya. At the time, Anaya was wearing blue jeans, a gray sweatshirt, and white shoes with red shoe laces, a red belt, and a red and black '49ers beanie.

Tony Espinoza is a detective with the Tulare Police Department assigned to the gang unit. On July 16, 2009, the detective came into contact with Mario Duarte and Manuel Rubio. Duarte and Rubio, accompanied by Johnny Hernandez, were sitting on a park bench in Tulare. Duarte was photographed wearing various items of red clothing. There was writing or gang graffiti on the table in red ink, and each of the individuals had a red permanent ink marker in his possession.

On January 29, 2010, Detective Espinoza was on duty and conducted a traffic stop of a vehicle; the front license plate was not fully secured. Wolfe was the driver and Steven Delgado was the passenger. In a photo taken during the traffic stop, Wolfe was photographed wearing various items of red clothing. A few days later, on February 4, 2010, Detective Espinoza assisted with the search of a residence. The car he had pulled over a few days earlier containing Wolfe was located at the home.

Detective Guzman was designated a gang expert. He estimated there were over 400 active gang members in Tulare. He described the formation of the Norteño gang and the signs and symbols related to the gang. The gang's activities included assaults, assaults with a deadly weapon, robberies, drug sales, and weapons possession. Guzman also testified to predicate offenses, gang packets, and the gang modules at the Bob Wiley Detention Facility.

In Detective Guzman's opinion, Wolfe is an active "Northerner" gang member and was on January 31, 2010. His opinion is based upon police reports, arrests, contacts, jail housing assignments, and information known to the department.

It is also the detective's opinion that Anaya is an active Northerner gang member and was on January 31, 2010. Guzman's opinion is based on the fact he asked Anaya if he was a gang member and Anaya responded, "'I guess so.'" His opinion is also based on Anaya's jail housing assignment and the fact that San Francisco '49ers clothing is typically worn as a symbol of the Northern gang.

Detective Guzman was also of the opinion that Delgado, Pompa, Duarte, Rubio and Rodriguez were all active gang members. Further, the detective believed A.T. was a gang member until January 31, 2010. He was no longer a gang member because he failed to pay his debt and because A.T. was considered a "rat" for telling the police about a crime committed by a fellow gang member.

Presented with a hypothetical situation involving similar facts, Detective Guzman believed the type of crimes alleged to have been committed would have been committed at the direction of and for the benefit of the Norteño criminal street gang. Additionally, those crimes would have been committed in association with the Norteño criminal street gang and furthered its objectives.

Defense expert Albert Ochoa, a behavioral interventionist, worked at a charter school in Visalia. He met with students, including those involved in gangs, every day. His past experience as executive director of a community center and mental health specialist at a youth services agency also put him in contact with young people involved in gangs, either as members or as associates. Ochoa has a certificate in basic counseling and psychology from La Puente Bible College. He is regularly contacted regarding his opinion on gang issues and has been previously certified as a gang expert in Tulare County.

Following his interviews with Wolfe and Anaya, and his review of the materials provided by Wolfe's attorney, Ochoa concluded that Wolfe and Anaya associate with the gang. In his opinion, they are not active gang members.

> On cross-examination, Ochoa indicated that a photograph of Anaya wearing items of red clothing, taken during a 2006 contact with law enforcement, would not change his opinion that Anaya was not a gang member because the photo was six years old. Ochoa indicated he had not listened to the phone call between Wolfe and his half brother so that fact was not considered for purposes of his opinion. Ochoa acknowledged that he is paid to testify. He further acknowledged that were he to have found Wolfe and Anaya to be active gang members, he would not have been paid. Ochoa could not opine as to whether Delgado, Pompa and the others were gang members because he did not interview them. Ochoa agreed that an associate of the gang does not "call shots." He further agreed that if someone "pleads to a crime" and admits a related gang enhancement, he would opine that individual is an active gang member.

People v. Anaya, 221 Cal. App. 4th 252, 257–65, 164 Cal. Rptr. 3d 216, 219–25 (2013), as modified on denial of reh'g (Nov. 5, 2013); (Lodged Doc. 22).

## III.    Jurisdiction and Venue

Relief by way of a writ of habeas corpus extends to a prisoner under a judgment of a state court if the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered a violation of his rights as guaranteed by the U.S. Constitution. Petitioner was convicted and sentenced in this district. 28 U.S.C. § 2241(d); 2254(a). The Court concludes that it has jurisdiction over the action and that venue is proper.

## IV.    Standard of Review

The instant petition was filed after April 24, 1996 and is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, a petition for a writ of habeas corpus by a prisoner in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n.7 (2000).

Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.    Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).

A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stressed that "an unreasonable application of federal law is different from an incorrect application of federal law." 131 S. Ct. 770, 785 (2011) (citing Williams, 529 U.S.

14

at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009) (quoting Richter, 131 S. Ct. at 786).

## 2. Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 131 S.Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that

those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87. This is because "state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

### 3.    Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis

applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n.7 (2002); Musalin v. Lamarque, 555 F.3d 830, 834 (9th Cir. 2009).

## IV. Review of Petition

### A. Claim One: Bolstering Credibility of Prosecution Witnesses

Petitioner contends an improper jury instruction unfairly bolstered the credibility of a prosecution witness. (ECF No. 1 at 5.)

#### 1. State Court Decision

The California Supreme Court summarily denied this claim. Accordingly, the Court "looks through" the Supreme Court's decision to the reasoned decision of the Fifth District Court of Appeal. See Ylst, 501 U.S. at 804. The Court of Appeal rejected Petitioner's claim as follows:

> Defendants contend the trial court erred when it instructed the jury with a portion of CALCRIM No. 226 that was inapplicable and, as a result, their rights to due process and the right to a jury assessment of the credibility of witnesses have been violated. Further, they assert the error was not harmless.
>
> **A. Applicable Standards**
>
> "'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (People v. Bolin (1998) 18 Cal.4th 297, 328.)
>
> "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (People v. Gonzales (2011) 51 Cal.4th 894, 940.)

> "In reviewing the purportedly erroneous instructions, 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.] In conducting this inquiry, we are mindful that " 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citations.]" (People v. Frye (1998) 18 Cal.4th 894, 957, overruled on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22.)

We consider the instructions as a whole, along with the jury's findings and the closing arguments of counsel. (People v. Cain (1995) 10 Cal.4th 1, 36; People v. Eid (2010) 187 Cal.App.4th 859, 883.) We will find error only if it is reasonably likely the instructions as a whole caused the jury to misunderstand the applicable law. (Estelle v. McGuire (1991) 502 U.S. 62, 74; People v. Kelly (1992) 1 Cal.4th 495, 525-527.)

**B. The Language of CALCRIM No. 226**

The jury was instructed with CALCRIM No. 226 as follows:

> "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate use your common sense and experience. You must judge the testimony of each witness by the same standards setting aside any bias or prejudice you may have. You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

> "In evaluating a witness's testimony you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: How well could the witness, see, hear, or otherwise perceive the things about which the witness testified.

> "How well was the witness able to remember and describe what happened?

> "What was the witness's behavior while testifying?

> "Did the witness understand the questions and answer them directly?

"Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with some one involved in the case or a personal interest in how the case is decided?

"What was the witness's attitude about the case or about testifying?

"Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

"How reasonable is the testimony when you consider all the other evidence in the case? Did other evidence prove or disprove any fact upon which the witness testified?

"Did the witness admit to being untruthful? Has the witness been convicted of a felony?

"Was the witness promised immunity or leniency in exchange for his testimony?

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember.

"Also, 2 people may witness the same event yet see or hear it differently. If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her you may conclude from a lack of discussion that the witness's character for truthfulness is good.

"If you do not believe a witness's testimony that he or she no longer remembers something that testimony is inconsistent with the witness's earlier statement on that subject. If you decide that a witness deliberately lied about something significant in this case you should consider not believing anything that witness says. Or, if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

**C. Analysis**

CALCRIM No. 226 instructs the jury on factors that it may consider in judging the credibility of a witness. We agree the trial court read to the jury an inapplicable portion of the instruction concerning character evidence: "If the evidence

19

establishes that a witness's character for truthfulness has not been discussed among the people who know him or her you may conclude from a lack of discussion that the witness's character for truthfulness is good." This portion of the instruction was simply not relevant or applicable in light of the testimony at trial. "It is error for a court to give an 'abstract' instruction, i.e., 'one which is correct in law but irrelevant[.]' [Citation.]" (People v. Rowland (1992) 4 Cal.4th 238, 282.) Indeed, the Bench Notes to CALCRIM No. 226 instruct that the challenged language should be given only "if relevant based on the evidence." The challenged portion of the instruction, addressing circumstances in which the jury could assume good character for truthfulness from the absence of a discussion among character witnesses about the witness's character for honesty, was irrelevant because no evidence supported it. Thus, the court erred in giving it.

However, this error did not prejudice defendants. We look to other instructions given to the jury in assessing prejudice. (People v. Sanders (1995) 11 Cal.4th 475, 536-537.) Here, the jurors were thoroughly instructed on how to evaluate the testimony of witnesses, which in addition to CALCRIM No. 226 included the following: CALCRIM Nos. 301 (Single Witness's Testimony), 302 (Evaluating Conflicting Evidence), 316 (Additional Instructions on Witness Credibility—Other Conduct), 318 (Prior Statements as Evidence), 332 (Expert Witness Testimony) and 333 (Opinion Testimony of Lay Witness). Significantly, too, the jury was instructed with CALCRIM No. 200, which provided in pertinent part: "Some of these instructions may not apply, depending on your findings about the facts of the case. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Thus, it is most likely the jury ignored the challenged portion of the instruction after correctly determining it was not relevant or applicable. (People v. Gonzales, supra, 51 Cal.4th at p. 940.) Additionally, as the Attorney General argues, the challenged language applied to all witnesses, not just the victim. Given the number of credibility factors and instructions, nothing suggests the verdicts obtained here were the result of any consideration of the challenged language. Notably too, neither party mentioned nor emphasized the challenged language in closing arguments to the jury, further reducing the likelihood of prejudice.

We find it is not reasonably likely the instructions as a whole caused the jury to misunderstand the applicable law. (Estelle

v. McGuire, supra, 502 U.S. at p. 74; People v. Kelly, supra, 1 Cal.4th at pp. 525-527.) In sum, the error was harmless under either the state or federal constitutional standard of error. (See Chapman v. California (1967) 386 U.S. 18, 24; People v. Watson (1956) 46 Cal.2d 818, 836.)

(Lodged Doc. 22 at 14-18.)

### 3. Analysis

The California Court of Appeal found that the trial court erred under state law by instructing the jury with an irrelevant portion of CALCRIM No. 226. However, this error of state law is not a basis for federal habeas relief. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991) (holding that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings).

Instead, a federal court's inquiry on habeas review is limited to whether the challenged jury instruction "violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." Id. On federal review, the pertinent question is whether the challenged instruction "so infused the trial with unfairness as to deny due process of law." Estelle, 502 U.S. at 75. Relevant to this inquiry is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Id. (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). The Court of Appeal applied this federal standard and concluded that such error was "not reasonably likely," and that, in any event, any error was harmless under Chapman. (Lodged Doc. 22 at 18.)

Under Chapman, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman, 386 U.S. at 24). However, when a state court's Chapman decision is reviewed under AEDPA, a habeas Petitioner must establish that the trial

court's error resulted in "actual prejudice." <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2197 (2015) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)). This requires more than a "reasonable possibility" that the error was harmful. <u>Brecht</u>, 507 U.S. at 637. Instead, the petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Davis</u>, 135 S.Ct. at 2199 (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011)). In other words, "a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." <u>Id.</u> (quoting <u>Fry v. Pliler</u>, 551 U.S. 112, 119 (2007)).

Here, the Fifth District Court of Appeal's harmlessness determination was not unreasonable. The state court considered the challenged portion of CALCRIM No. 226 in the context of the jury instructions as a whole. The state court noted that the jury was given multiple instructions on how to evaluate the testimony of witnesses, including CALCRIM No. 200, which specifically points out that some of the given instructions may be inapplicable. The court concluded that the jury most likely ignored the challenged portion of the instruction since it was irrelevant. This decision is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Richter</u>, 562 U.S. at 103.

Accordingly, Petitioner is not entitled to relief on this claim.

**B. Claim Two: Undermining Petitioner's Credibility**

Petitioner contends that his due process rights were violated by a jury instruction regarding consciousness of guilt. Petitioner contends that the instruction was not warranted and improperly impugned Petitioner's credibility.

The instruction at issue reads as follows:

> If defendant ERIC THOMAS WOLFE and ADAM DANIEL ANAYA made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in

22

determining his guilt. You may not consider the statement in deciding any other defendant's guilt.

If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself.

(ECF No. 1 at 7; Lodged Doc. 4 at 878.)

Petitioner argues that this instruction was inapplicable because there was no evidence of false statements by Petitioner. (ECF No. 1 at 22.) He nonetheless opines that the jury may have inferred from this instruction that Petitioner had been untruthful. He suggests that the jury may have found this instruction applicable based on Petitioner's statements to detectives that he had gone to the house to collect computer equipment that had been sold to his co-defendant Wolfe, a statement that was inconsistent with other evidence adduced at trial.

## 1.    State Court Decision

Petitioner presented this claim in his petition for writ of habeas corpus to the California Supreme Court. (Lodged Doc. 28.) The Supreme Court denied the claim without comment. (Lodged Doc. 29.) Nevertheless, whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

## 2.    Analysis

The analysis of this claim is essentially the same as that for Petitioner's first claim.

Here, a reasonable jurist could conclude that the jury had no basis to apply the challenged instruction in a way that violates the Constitution. Estelle, 502 U.S. at 75. The

23

jury was free to accept or reject the defendants' version of the facts. The challenged instruction clearly states that it is the province of the jury to determine the "meaning and importance" of any statement made by the defendant that the jury determines to be false.

Additionally, a reasonable jurist could conclude that any error in giving the instruction was harmless beyond a reasonable doubt under Chapman. Chapman, 386 U.S. at 24). Certainly, such a conclusion would not be so unreasonable as to meet the extremely deferential standard applicable on federal review. Davis, 135 S.Ct. at 2199. As stated above, the jury was given multiple instructions on how to evaluate the testimony of witnesses, including CALCRIM No. 200, which specifically points out that some of the given instructions may be inapplicable. The Court cannot say that, in rejecting this claim, the California Supreme Court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103.

## C.    Claim Three: Insufficient Evidence

Petitioner claims there was insufficient evidence to support his conviction for extortion. More specifically, Petitioner argues that the victim's statement that he felt he had no choice but to hand over his money was insufficient to support an extortion conviction. Instead, these allegations support a robbery charge and, under state law, should have been aggregated into the single robbery charge Petitioner was convicted under.

### 1.    State Court Decision

The Fifth District Court of Appeal rejected this claim in a reasoned opinion. (Lodged Doc. 22.) Petitioner then petitioned for review to the California Supreme Court (Lodged Doc. 26), and his petition was summarily denied (Lodged Doc. 27). However, Petitioner's Supreme Court petition arguably presented the issue more narrowly than it is presented here. There, Petitioner argued only that the evidence was insufficient to

support an extortion conviction "because there is insufficient proof that the victim's cash was given with consent induced by force or threat." (Lodged Doc. 26 at 12.) Petitioner challenged the Court of Appeal's finding that the testimony of the victim, A.T., was sufficient to support a finding of coerced consent because he testified he felt he had no choice. (Id.) Thus, there may be some question as to the extent to which this claim is exhausted. Nevertheless, the Court will address this claim on the merits because it is clear Petitioner's potentially unexhausted claims do not raise a colorable federal claim. Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005)

The Fifth District Court of Appeal rejected this claim as follows:

> Defendants contend there is insufficient evidence to support their convictions pertaining to extortion because there is no evidence the victim "was placed in the position of having the choice of paying money or being killed before [he] handed over the cash he had on his person" and because the victim "testified he had no choice." Additionally, defendants assert that because the "takings were both accomplished with the use of the same force, from the [victim]'s immediate presence, and the evidence demonstrated that the takings were both committed with intent to permanently deprive [the victim] of his money and property … there was but a single episode of robbery under the Bailey doctrine," requiring reversal of the convictions for extortion.
>
> "Extortion is the obtaining of property from another, with his consent, … induced by a wrongful use of force or fear …." (§ 518.) Relevant here, section 519 further provides that "Fear, such as will constitute extortion, may be induced by a threat, either: [¶] … To do an unlawful injury to the person or property of the individual threatened or of a third person …." Section 520 provides as follows:
>
>> "Every person who extorts any money or other property from another, under circumstances not amounting to robbery or carjacking, by means of force, or any threat, such as is mentioned in Section 519, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for two, three or four years."

### *1. Relevant Testimony and Argument*

The following colloquy concerned the testimony about money and property taken from A.T.:

"[PROSECUTOR:] Q. Okay. Now let's back up because that was a lot of information. So you get punched, some of the guys in there are saying get back in the circle and [defendant] Wolfe says round everything up, this guy owes money and he is pointing at you pretty much?

"[A.T.:] A. Yeah.

"Q. Well obviously. How, was that right after the punch pretty much?

"A. Yeah, yeah.

"Q. Okay. And do people start going and taking property at that point?

"A. Yes.

"Q. Do they start going through the house?

"A. Yes.

"Q. Okay. And did you have any property at the house?

"A. Some, yes.

"Q. Okay. And but most would it be fair to say that most of the items in there were your aunt's and your uncle's?

"A. Yes, her house, it is her house, of course.

"Q. Now did you have any money on you as well?

"A. Yes.

"Q. And if you recall approximately how much money?

"A. I believe it was 200? 200 something.

"Q. 200 some dollars?

"A. Yes.

"Q. Did you try to give that money to them?

"A. Yes.

"Q. Now was that taken from you or did you hand it over?

"A. It was taken. It was handed over.

"Q. All right. You handed it over?

"A. Yes.

"Q. Did you feel at that moment that you had any choice?

"A. No. No.

"Q. Okay. And the property, now you didn't obviously, did you hand it to them or did they just go back in the room and take it?

"A. They went back in the room and as I followed them they were like on me like whoa, what are you trying to grab? I am not trying to grab nothing. What are you trying to get? And I was, I don't have no weapon, dudes. I am not trying to get nothing."

During closing argument, the People argued as follows with regard to the extortion counts:

"[PROSECUTOR:] Now Count 1, extortion, now you could say that the computer fall[s] in this category as well and convict for the computer as well. However I think Count 1, extortion, the money is more appropriate because [A.T.] testified that he handed over the money. The defendant threatened to unlawfully injure or use force against another person or a third person. Well we have the Roy Gomez, we have the force against [A.T.], we have the encircling of Roy Gomez, there is all sorts of displays of force or fear going on out there. When making the threat the defendant intended to use that fear or force to obtain the other person's consent to give the money or property. In that case he consented to hand over the property. When the other person consented to give the defendant money or property and as a result of the threat or use of force the other person then gave the

27

defendant money or property. And that would be handing the money to [defendant] Wolfe.

"Now [defendant] Wolfe was very active in carrying out this and demanding money and telling him that he is going to pay up. [Defendant] Anaya was there standing look out while all this is going on and you remember [A.T.'s] testimony that well initially when they are outside [defendant] Anaya stood on the curb and announced, 'cops' and that is when they went inside. And when they are inside and when he got punched standing in the living room he then, [defendant] Anaya was standing at the window looking out. [¶] … [¶]

"Now consent for extortion can be coerced or unwilling as long as it is given as a result of the wrongful use of force and is cut off the fear [sic]. Both the defendants, [defendant] Anaya, [defendant] Wolfe are guilty of extortion. They came there to get money, they used force or fear and … [A.T.] because of that force or fear consented to hand over his money."

### 2. Choice or Lack of Consent

Because the victim testified he had no choice, defendants contend there is insufficient proof of extortion.[FN15] For purposes of establishing extortion, the victim's consent is "coerced and unwilling." (People v. Goodman (1958) 159 Cal.App.2d 54, 61.) "The victim of an extortioner might openly consent to the taking of his money 'and yet protest in his own heart' against its being taken." (People v. Goldstein (1948) 84 Cal.App.2d 581, 586.) Therefore, the victim of extortion does not, in actuality, "consent" to the taking of his property. That element is more precisely a "coerced consent," which amounts to no consent at all. (See People v. Davis (1998) 19 Cal.4th 301, 305, fn. 3.) It is the use of force or threat to induce consent that sets extortion apart from theft. (People v. Goldstein, supra, at pp. 585-586.) Here, defendants and others, by their behavior and words, coerced the victim into handing over the money then in his possession. The victim had already observed the group harassing his cousin outside, he himself had been struck in the face and verbally harassed once the group had moved inside the house, his aunt's possessions were being rifled through, and he was repeatedly advised that he owed a debt that must be repaid in the near future in order to avoid further harm. The victim offered his own money while his relatives' property was also

being identified for collection toward repayment of his debt. His offering or handing over the cash amounted to coerced consent. The force and fear employed by defendants and others induced the victim to hand over the cash. There is sufficient evidence of extortion. The individuals then went into the room the victim shared with his cousin. The victim's own property, computers, were taken without his consent. That conduct forms the basis of the robbery convictions. We find coerced consent to be the equivalent of a lack of choice. Therefore, when A.T. testified he felt as though he had no choice, that testimony spoke to the element of coerced consent.

> [FN15] In popular parlance, extortion is "sometimes called 'blackmail.'" (<u>People v. Sales</u> (2004) 116 Cal.App.4th 741, 748.)

To the degree defendants can be understood to argue that because the elements of extortion when applied factually may also meet the elements of robbery, and thus only the crime of robbery has been committed, they are incorrect.

Robbery is the "taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Extortion, however, is the obtaining of property from another with his or her consent induced by force or fear. (§ 518.) The offenses are "structurally similar" and are rooted in the common law of larceny. (<u>People v. Kozlowski</u> (2002) 96 Cal.App.4th 853, 866; <u>People v. Hesslink</u> (1985) 167 Cal.App.3d 781, 790.) Robbery and extortion share a comment element: the taking of property with force or fear. Nevertheless, they are distinguishable. Robbery requires a taking against the victim's will. Extortion requires a taking with the victim's consent. (<u>People v. Torres</u> (1995) 33 Cal.App.4th 37, 50.)

In <u>Torres</u>, the defendant was a "rent collector for a Los Angeles street gang. While performing his collection duties, the defendant shot and killed a drug dealer. The defendant also attempted to obtain money at gunpoint from a passerby who was not a drug dealer. (<u>People v. Torres</u>, <u>supra</u>, 33 Cal.App.4th at p. 42.) At trial, a police officer with the gang unit testified without objection that the defendant attempted to rob both of his victims; he also testified as to his interpretation of the crimes of robbery and extortion. The jury found the defendant guilty of first degree murder in perpetration of an attempted robbery, in addition to

two counts of attempted robbery. On appeal, the defendant alleged error regarding the officer's opinions on the crimes committed and the defendant's guilt associated with those crimes. (Id. at pp. 42-44.) The court agreed with the defendant that a witness may not express an opinion regarding the definition of a crime, and may not express an opinion regarding the defendant's guilt or innocence. (Id. at pp. 45-48.) In addressing the ineffectiveness of the defendant's trial counsel for his failure to object to the expert's testimony, the court noted the following:

> "One distinction between robbery and extortion frequently noted by courts and commentators is that in robbery property is taken from another by force or fear 'against his will' while in extortion property is taken from another by force or fear 'with his consent.' The two crimes, however, have other distinctions. Robbery requires a 'felonious taking' which means a specific intent to permanently deprive the victim of the property. [Citation.] Robbery also requires the property be taken from the victim's 'person or immediate presence.' [Citation.] Extortion does not require proof of either of these elements. [Citations.] Extortion does, however, require the specific intent of inducing the victim to consent to part with his or her property." (Id. at p. 50, fn. omitted.)

Even if the facts meet the elements of the crime of robbery, because extortion requires the specific intent to induce the victim to consent to part with his property, defendants' crime in taking A.T.'s cash amounts to extortion, not robbery.

In sum, after reviewing the entire record in the light most favorable to the judgment, there is substantial evidence to support the extortion convictions.

### 3. The Bailey Rule

More than 50 years ago, the California Supreme Court decided People v. Bailey (1961) 55 Cal.2d 514. There, the defendant committed welfare fraud and received a number of payments, none of which alone sufficed to constitute grand theft. Collectively, however, the fraud would serve to constitute grand theft. The court determined the defendant was properly convicted of grand theft rather than a series of petty thefts. It authorized the aggregation of separate acts of theft into a single offense for the purpose of bringing a felony allegation when the thefts were committed pursuant to a

single intent, impulse, and plan. (Id. at pp. 518–519.) This holding has become known as the Bailey rule. The Bailey rule has been extended to prevent a defendant from being convicted of more than one count of grand theft where the takings were committed against a single victim and the evidence discloses only one general intent. (People v. Richardson (1978) 83 Cal.App.3d 853, 866, disapproved on other grounds in People v. Saddler (1979) 24 Cal.3d 671, 682, fn. 8; People v. Packard (1982) 131 Cal.App.3d 622, 626; People v. Kronemyer (1987) 189 Cal.App.3d 314, 363-364.) For the next 47 years, the Bailey rule was limited to theft cases. (People v. Neder (1971) 16 Cal.App.3d 846, 852 [not extended to forgery]; People v. Drake (1996) 42 Cal.App.4th 592, 596 [not extended to fraud]; People v. Washington (1996) 50 Cal.App.4th 568, 575, 577–578 [not extended to burglary].)

Defendants contend that the "multiple convictions of robbery and extortion committed against [the victim are] an indivisible transaction with the single intent and objective of collecting a debt owed to the gang." Thus, because the Bailey doctrine precludes "multiple takings from the same victim [in] a single theft if the takings are pursuant to one continuing impulse, intent, plan, or scheme," defendants contend their convictions must be reversed.

The question of whether multiple takings are committed pursuant to one intention, general impulse, and plan is a question of fact for the jury based on the particular circumstances of each case. (People v. Packard, supra, 131 Cal.App.3d at p. 626.) On appeal, we uphold the fact finder's conclusion if it is supported by substantial evidence. (People v. Tabb (2009) 170 Cal.App.4th 1142, 1149-1150.) Where the evidence supports only one reasonable conclusion, the question may be resolved as a matter of law. (Packard, supra, at pp. 626-627.)

Defendants rely upon a number of authorities in support of their assertion that because there was a single intent and objective in collecting a debt owed to the gang, their "multiple convictions of robbery and extortion" should be reversed. However, there are factual distinctions present in those cases that are not present here. In Bailey, the defendant engaged in multiple acts of petty theft (People v. Bailey, supra, 55 Cal.2d at p. 518); in Richardson, the defendant engaged in multiple acts of attempted grand theft (People v. Richardson, supra, 83 Cal.App.3d at p. 857); in Packard, the defendant engaged in multiple acts of grand theft (People v. Packard, supra, 131

Cal.App.3d at p. 625); and in <u>Kronemyer</u>, the defendant engaged in multiple acts of grand theft (<u>People v. Kronemyer</u>, <u>supra</u>, 189 Cal.App.3d at p. 324). Here, in contrast, instead of being convicted of multiple counts of the same offense, defendants were convicted of different offenses, albeit theft-related offenses.

We note that unlike the aforementioned authorities where it was plain the defendant had a single intent and objective, in light of the particular circumstances here, the contrary can be reasonably inferred. The intent and objective of the visit to the Gomez residence did involve collection of a gang debt. But the takings here are distinct, and that sets them apart. Because robbery and extortion are distinguishable regarding the manner of the takings involved—one with coerced consent and one in the absence of consent—it follows that the intent and objectives of those crimes can be different. An objective of the crime of extortion involves inducing consent; no such objective is present in a robbery. Said another way, the takings in the cases finding the <u>Bailey</u> rule applicable did not involve different objectives. Notably too, the evidence establishes that the crime of extortion arose during the course of the robbery. It can be inferred that because the offer to pay the cash was made by A.T. in the first instance, instead of in response to a request by defendants or anyone else present, that particular crime was not planned. Thus, while the objective was to collect a gang debt by way of a home invasion robbery, there is no evidence to suggest the gang planned and intended to collect upon its debt by way of extortion.

Thus, we find the <u>Bailey</u> rule does not apply to bar defendants' convictions for both robbery and extortion.

(Lodged. Doc. 22 at 19-27.)

2.    **Analysis**

a.    <u>**Bailey**</u>

To the extent Petitioner argues that <u>Bailey</u> required he be convicted of only one offense, rather than convicted of both extortion and robbery, he raises an issue of California state law that is not cognizable in federal habeas proceedings. <u>See</u> <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal

courts."); Estelle, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). He is not entitled to relief on this basis.

**b.    Double Jeopardy**

Construed liberally, the Petition may be read to claim that convicting Petitioner of both robbery and extortion violated double jeopardy.

The Double Jeopardy clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932):

Under California law, the offenses of robbery and extortion each require elements that the other does not. The California Penal Code defines extortion as "the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear." Cal. Penal Code § 518. Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211. As noted by the Fifth District Court of Appeal in this case, the California courts have explained:

> One distinction between robbery and extortion frequently noted by courts and commentators is that in robbery property is taken from another by force or fear "against his will" while in extortion property is taken from another by force or fear "with his consent." The two crimes, however, have other distinctions. Robbery requires a "felonious taking" which means a specific intent to permanently deprive the victim of the property. Robbery also requires the property be taken from the victim's "person or immediate presence." Extortion does not require proof of either of these elements. Extortion does, however, require the specific intent of inducing the victim to consent to part with his or her property.

33

(Lodged Doc. 22 (quoting People v. Torres, 33 Cal. App. 4th 37, 50 (Cal. Ct. App. 1995) (citations and footnote omitted)).

Robbery and extortion are separate crimes and separate sentences may be imposed for each violation without violating double jeopardy. Cf. Eckert v. Tansy, 936 F.2d 444, 450 (9th Cir. 1991) (holding that convictions for robbery and extortion under Nevada law did not violate double jeopardy).

### c. Sufficiency of the Evidence

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 132 S.Ct. 2, *4, 181 L.Ed. 2d 311 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the federal habeas court must find that the decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. Thus, when a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

As applicable here, "[e]xtortion is the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear." Cal. Penal Code § 518. In other words, "[t]o constitute extortion the victim must consent, albeit it is a coerced and unwilling consent." People v. Goodman, 159 Cal. App. 2d 54, 61 (Cal. Ct. App. 1958). See also People v. Goldstein, 84 Cal. App. 2d 581, 586 (1948) ("The victim of an extortioner might openly consent to the taking of his money 'and yet protest in his own heart' against its being taken." (quoting People v. Peck, 43 Cal. App. 638, 645 (Cal. Ct. App. 1919))).

A.T. testified he was encircled by several individuals and hit in the face. Shortly thereafter, he "handed over" his money to these individuals, feeling that he had no choice. (Lodged Doc. 12, RT7 165-66, 169-70.) The Fifth District Court of Appeal found these facts sufficient for a jury to find the victim was induced to consent to part with his property. Viewing the record in the light most favorable to the prosecution, the state court's sufficiency determination was not objectively unreasonable. A rational trier of fact could have found true beyond a reasonable doubt that A.T. consented to the taking of

the money, by way of a coerced and unwilling consent, and that Petitioner therefore committed extortion.

Petitioner is not entitled to relief on this claim.

**V.    Conclusion and Recommendation**

Based on the foregoing, it is HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

The findings and recommendation are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty** (30) days after being served with the findings and recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   September 10, 2017        /s/ Michael J. Seng

UNITED STATES MAGISTRATE JUDGE